**I**

# TUCKER ELLIS & WEST LLP

### ATTORNEYS AT LAW

1150 Huntington Bldg.   925 Euclid Avenue   Cleveland, Ohio   44115-1475
phone 216.592.5000   facsimile 216.592.5009   tuckerellis.com

CLEVELAND    LOS ANGELES    SAN FRANCISCO

Direct Dial: 216.696.2365
Email: Edward.Taber@tuckerellis.com

October 1, 2003

**VIA FACSIMILE:  (513) 852-5611**
**AND REGULAR U.S. MAIL**

Janet Abaray, Esq.
Calvin S. Tregre, Jr., Esq.
Lopez, Hodes, Restaino,
 Milman, Skikos & Polos
312 Walnut Street, Suite 2090
Cincinnati, Ohio  45202

> Re:   *Pamela S. Silvey, et al. v. SmithKline Beecham Corporation*
>       U.S.D.C., Southern District of Ohio, Western Division
>       Case No. C-1-01-164 / Judge Herman J. Weber
>       MDL # 1407 - Judge Barbara Jacobs Rothstein

Dear Janet & Calvin:

Thank you for your fax dated September 30, 2003, responding to my prior letter dated September 29, 2003 wherein defendant suggested a date of October 17, 2003 at 11 a.m. for the deposition of treating surgeon Harry Van Loveren, M.D. According to your fax, plaintiffs are objecting to Dr. Van Loveren's deposition as being noticed after the case-specific fact discovery cut-off. I am surprised at your objection, and please be advised that we intend to go forward with his deposition at that time.

To date, and despite numerous requests, we have not received a substantially complete PFS from plaintiffs in this case, nor have we received the medical authorizations that were forwarded to you months ago, nor have you responded in writing to my letters requesting an updated PFS, nor have you produced other materials that were to be provided shortly after Ms. Sivley's deposition many months ago.

According to Judge Rothstein's November, 2002 Order, the deadline for fact discovery does not run until a *substantially complete* PFS is received from plaintiffs. In this particular case, defendant has taken great pains to recite the numerous deficiencies in the original PFS, and repeatedly asked for a substantially complete PFS. By way of example, the original PFS made no mention of the very significant fact that Ms. Silvey herself was a participant in the Yale Study, and that both she and her husband specifically denied PPA use in 1998 when they were interviewed for the Yale study. In addition, my letter of February 17, 2003 (sent at your request)

## TUCKER ELLIS & WEST LLP
ATTORNEYS AT LAW

Calvin S. Tregre, Jr., Esq.
October 1, 2003
Page 2

specifically itemized no less than 22 separate, material deficiencies in the original PFS that required updates (which have not been provided). These deficiencies are not minor, irrelevant matters, but issues at the heart of this litigation, including in excess of fifteen medical providers that were not disclosed in the original PFS (including Yale study personnel), significant product use information that was left out of the original PFS, the fact that *no PFS information* was ever provided for plaintiff Kenneth Silvey, the omission of at least two separate stroke-related medical study records pertaining to the very hospitalization in question, etc.. As you can imagine, it's extraordinarily difficult for defendant to identify which treating physicians to depose, when plaintiffs haven't identified all the treating physicians, and when plaintiffs have not provided medical authorizations to obtain those treating physicians' records.

In our follow up discussions during and after the deposition of Ms. Sauerbeck, you indicated that plaintiff had no objection to a reasonable extension of the discovery cut-off. In fact, there was no objection to Ms. Sauerbeck's deposition as being "after" the discovery cut-off. Moreover, in our discussions after Ms. Sauerbeck's deposition, we both informally discussed a mutual extension of the discovery cut-off to complete any remaining discovery. It is true that it has been a few months since we last reminded plaintiffs of the outstanding PFS deficiencies, but the ball has clearly been "in your court," on this issue. I have been operating under the assumption that plaintiffs have been gathering information to update their PFS answers. That's why it is surprising that plaintiffs are now objecting to discovery in a case where plaintiffs have not complied with their own discovery obligations, despite defendant's multiple requests, and despite Judge Rothstein's November, 2002 Order.

In any event, please let this letter serve as yet another request for an updated PFS, including the updated medical authorizations that were forwarded to you many months ago. It would, of course, be our preference to work out this minor discovery dispute amicably rather than bothering Judge Rothstein again on this case. Please feel free to call if you have any questions or concerns.

Very truly yours,

Edward E. Taber

EET/vmv

cc:    Robert C. Tucker, Esq.

**J**

# TUCKER ELLIS & WEST LLP

ATTORNEYS AT LAW

1150 Huntington Bldg.   925 Euclid Avenue   Cleveland, Ohio   44115-1475
phone 216.592.5000  facsimile 216.592.5009  tuckerellis.com

CLEVELAND   LOS ANGELES   SAN FRANCISCO

Direct Dial: 216.696.2365
Email: ETaber@tuckerellis.com

October 21, 2003

Janet G. Abaray, Esq.
Calvin S. Tregre, Jr., Esq.
Lopez, Hodes, Restaino,
  Milman, Skikos & Polos
312 Walnut Street, Suite 2090
Cincinnati, Ohio  45202

> Re:  *Pamela S. Silvey, et al. v. SmithKline Beecham Corporation*
>       U.S.D.C., Southern District of Ohio, Western Division
>       Case No. C-1-01-164 / Judge Herman J. Weber

Dear Janet and Calvin:

By way of follow-up on our recent discussions regarding discovery, we would like to wrap up local discovery on this case by the end of the year at the latest. With that timetable in mind, I would very much appreciate receiving an updated PFS, and signed authorizations, by October 31st. Medical records authorizations were previously sent to you based on the form applicable at that time. Given the arrival of the HIPAA legislation, I am enclosing updated HIPAA-compliant authorizations for your client's signature.

Finally, there was one error in my letter to you dated September 30, 2003, relating to PFS information from Ken Silvey. This was an error and you may disregard that particular "deficiency" from the original PFS.

Please advise in writing if you anticipate any problem with responding to these discovery requests, so that, if necessary, I can promptly file a motion to compel (which I would prefer to avoid, if possible).

I thank you in advance for your attention to these matters. Please feel free to call if you have any questions or concerns.

Very truly yours,

Edward E. Taber

EET/vmv
Enclosure

cc:   Robert C. Tucker, Esq.

TO:       Joseph P. Broderick, M.D.
          Name of Provider/Facility
Patient Name:   Pamela Sue Silvey aka Pamela Sue Day
DOB:      February 1, 1963
SS#       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

I, Pamela Sue Silvey (D.O.B. 2/1/1963; SSN No. 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), plaintiff in the case of *Pamela S. Silvey, et al. v. SmithKline Beecham Corporation,* United States District Court, Southern District of Ohio, Western Division, Case No. C-1-01-164, authorize you to disclose and release the following protected health information (PHI) for the period from 1982 through the present, including:

**MEDICAL RECORDS:** any and all medical records, all inpatient and out patient charts and records, hospital charts and records, doctor and nurse notes, emergency room records, correspondence, memoranda, physical therapy and rehabilitation, patient questionnaire forms, patient history forms, social service records, laboratory reports, diagnostic reports, diagnostic tests or imaging, pathology reports, pathology recuts or pathology slides, x-rays, MRI films, CAT scans, brain scans, and EKG tracings in all forms including original films, copy of computer storage of the data on disk or tape and a copy of the reports.

**PRESCRIPTION RECORDS:** any and all prescription records, the issuance of sale of prescription drugs, original doctor's prescription forms, refill records and pharmacy records.

**BILLING RECORDS:** any and all billing records, including itemized statements of charges, payments, all insurance records, including all claims, claim forms, correspondence, payments and reports.
Also, please disclose and release the following protected health care information (only if checked below):
          (check)       √    Drug and Alcohol Records
                        √    HIV and AIDS Records
                        √    Mental Health Records
This protected health information is disclosed for the following purposes:   Preparation of litigation
You are authorized to release the above records to the following representatives of defendants in the above-entitled matter who have agreed to pay reasonable charges made by you to supply copies of such records:

 Robert C. Tucker, Esq., Edward E. Taber, Esq.
or any other attorney or legal assistant from the law firm of Tucker Ellis & West LLP
**Name of Representative(s)**
Attorneys for Defendants, SmithKline Beecham Corporation
**Representative Capacity** (e.g. attorney, records requestor, agent, etc.)
1150 Huntington Bldg, 925 Euclid Avenue
**Street Address**
Cleveland, OH 44115
**City, State and Zip Code**

Your health care (or payment for care) will not be affected by whether or not you sign this authorization.

This authorization shall be in force and effect until 1/1/04, at which time this authorization expires.
I have the right to revoke this authorization, in writing, by sending written notification to you. I understand that a revocation is not effective to the extent that you have relied on my authorization to disclose protected health information. I understand that the information may be redisclosed and no longer subject to protection. I understand that I have the right to:
   • Inspect or copy the individually identifiable health information to be disclosed.
   • Refuse to sign this authorization.

_____

**Signature of Patient or Personal Representative**


_____
**Dated**
   Pamela Sue Silvey
**Name of Patient or Personal Representative**

_____
**Description of Personal Representative's Authority to Sign for Patient** (attach documents which show authority)

# K

1

1       UNITED STATES DISTRICT COURT

2       SOUTHERN DISTRICT OF OHIO

3       WESTERN DIVISION

4       —   —   —

5   PAMELA S. SILVEY AND       :

6   KENNETH E. SILVEY,         :

7       PLAINTIFFS,            :

8   -VS-                       :   CASE NO. C-1-01-164

9   SMITHKLINE BEECHAM         :

10  CORPORATION,               :

11      DEFENDANT.             :

12      —   —   —

13      UNITED STATES DISTRICT COURT

14      WESTERN DISTRICT OF WASHINGTON

15      AT SEATTLE

16  - - - - - - - - - - - - - - - -

17  IN RE PHENYLPROPANOLAMINE (PPA) :

18  PRODUCTS LIABILITY LITIGATION  :  MDL NO. 1407

19  - - - - - - - - - - - - - - - -

20      Deposition of LAURA R. SAUERBECK, R.N., a

21  witness herein, taken by the defendant as upon

22  cross-examination pursuant to the Federal Rules of

23  Civil Procedure and pursuant to Notice to Take

24  Deposition and Subpoena Duces Tecum duly issued

2

1    and served, and stipulations hereinafter set forth

2    at the Cincinnati Marriott Rivercenter, 10 West

3    Rivercenter Boulevard, Covington, Kentucky, at

4    2:32 p.m. on Thursday, March 13, 2003, before Lois

5    A. Roell, RMR, a notary public within and for the

6    State of Kentucky, and also by audiovisual means

7    before Susan M. Sharp.

8                        -    -    -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

3

1    APPEARANCES:

2      On behalf of the Plaintiffs:

3            Janet G. Abaray, Esq.

4                  and

5            Calvin S. Tregre, Jr., Esq.

6                  of

7            Lopez, Hodes, Restaino, Millman & Skikos

8            312 Walnut Street, Suite 2090

9            Cincinnati, Ohio  45202

10     On behalf of the Defendant:

11           Robert C. Tucker, Esq.

12                 and

13           Edward E. Taber, Esq.

14                 of

15           Arter & Hadden, LLP

16           1100 Huntington Building

17           925 Euclid Avenue

18           Cleveland, Ohio  44115-1475

19     On behalf of the Witness:

20           E. Jason Atkins, Esq.

21                 of

22           Hemmer, Spoor, Pangburn, DeFrank, PLLC

23           250 Grandview Drive, Suite 200

24           Ft. Mitchell, Kentucky  41017

4

1                    S T I P U L A T I O N S

2            It is stipulated by and among counsel for

3    the respective parties that the deposition of

4    LAURA R. SAUERBECK, R.N., a witness herein, may be

5    taken as upon cross-examination pursuant to the

6    Federal Rules of Civil Procedure and pursuant to

7    Subpoena and Notice to Take Deposition; that the

8    deposition may be taken by audiovisual means by

9    the videographer and in stenotypy by the notary

10   public-court reporter and transcribed by her out

11   of the presence of the witness; that the

12   transcribed deposition is to be submitted to the

13   witness for her examination and signature, and

14   that signature may be affixed out of the presence

15   of the notary public-court reporter.

16                        -   -   -

17                      I N D E X

18   WITNESS                      CROSS-EXAMINATION

19   Laura R. Sauerbeck, R.N.    7, 76, 79 (Mr. Tucker)

20                               61, 78  (Ms. Abaray)

21                        -   -   -

22

23

24

5

```
1                    E X H I B I T S

2    DEFENDANT'S EXHIBITS                        MARKED

3    No. 1, a 6-page Curriculum Vitae, bates        6

4       stamped HSP-UN-0000484 through 489.

5    No. 1-A, a 10-page Curriculum Vitae,           8

6       described as an updated version.

7    No. 2, a binder divided into Sections          6

8       1 through 9 containing information on

9       the Hemorrhagic Stroke Project.

10   No. 3, a 2-page letter to Pamela Silvey        6

11      from Joseph Broderick, MD, and Laura

12      Sauerbeck, RN, dated November 1, 2000.

13                      -   -   -

14

15

16

17

18

19

20

21

22

23

24
```

27

1    complained of feeling ill on 1/15/98.

2    Approximately 45 minutes after the case had left

3    for work, he found her van in a ditch with slight

4    damage.  Case was restrained by seat belt and

5    unresponsive."

6            Q.    Now, there is a subject interview

7    questionnaire form that you would have filled out

8    in the course of interviewing Mrs. Silvey; am I

9    right about that?

10           A.    Correct.

11           Q.    Am I right to understand that that's

12   what's called Form 04?

13           A.    Yes.

14           Q.    And do you have Form 04 in front of

15   you?

16           A.    Yes.

17           Q.    Would you please tell us is that

18   your handwriting?

19           A.    Yes.

20           Q.    And it says person completing form,

21   303, that's your number?

22           A.    Uh-huh.

23           Q.    And it says that the date of the

24   interview was February 13, 1998; is that right?

28

1          A.    Yes.

2          Q.    Does it give a time?

3          A.    9:30 a.m.

4          Q.    Okay.   In the course of the

5    interview, would you explain to the case or to the

6    patient, the subject, what the interview was

7    about, why you were conducting it?

8          A.    Well, we first would approach the

9    case, we had a script to go for -- go by, and

10   that's on Form 03C.

11         Q.    And generally would you tell us what

12   that script was that you would tell the patient.

13         A.    It says, "Hello, my name is," and I

14   would introduce myself.  "I am working with the

15   Hemorrhagic Stroke Project.   This is a research

16   study designed -- or excuse me, this is a research

17   study investigating the causes of stroke in young

18   people.   This study is being conducted from Yale

19   University School of Medicine," and in parentheses

20   it says "in Connecticut, and we are visiting

21   patients at 43 hospitals nationwide, including,"

22   and I would say "Good Samaritan Hospital.   Your

23   doctor, Dr. VanLoveren, has given us permission to

24   talk with you.   Is this a good time to speak with

32

1   illness symptoms that you asked her if she had

2   experienced in the last two weeks?

3           A.    Runny nose, nasal congestion, sore

4   throat, and headache.

5           Q.    How did she answer the question to

6   each of those common illness symptoms?

7           A.    She answered no to all of them.

8           Q.    During the course of the questioning

9   about illness symptoms and medication use, did you

10  inquire as to whether she was taking any

11  medication?

12          A.    For those symptoms?

13          Q.    Yes.

14          A.    No.  Once they answer no, you go on

15  to the next question.

16          Q.    Because she hadn't had any of those

17  symptoms, right?

18              MS. ABARAY:  Objection, leading.

19          A.    The protocol states if they answer

20  no, refused, or don't know, you would go on to the

21  next question without asking about medications.

22          Q.    And what would be the next question?

23          A.    After cough would be runny nose,

24  then nasal congestion, then sore throat, and then

33

1    headache.

2          Q.    And then after finding, getting nos

3    to all of those questions, what's the next

4    question you asked?

5          A.    "Now I would like you to try to

6    recall any medications you may have used during

7    this time period.  Please look at the calendar

8    again and take a minute to think about any other

9    medications or drugs you may have taken on the

10   index date or on the three days before that date

11   or at any time during these two weeks.  We are

12   interested in any medication you may have taken,

13   including those prescribed by a doctor or that you

14   bought over-the-counter."

15         Q.    And what did she answer to that?

16         A.    She -- I have none recalled.  So I

17   don't know what her exact words were but --

18         Q.    She answered -- What were the

19   choices that she could have given you?

20         A.    She could have listed any

21   medications that she recalled.

22         Q.    You circled here none recalled?

23         A.    Uh-huh.

24         Q.    With respect to illness symptoms and

34

1    medication use, did you have other questions that

2    you asked her?

3         A.    I guess you're asking about the same

4    section of the questionnaire?

5         Q.    Yes.  Did you go on from that last

6    question?

7         A.    Right.

8         Q.    And were there additional questions

9    about specific medications?

10        A.    Yes.

11        Q.    And what was that question?

12        A.    "Now I would like to review some

13   specific medications you may have taken during

14   this time period.  Did you take," and then I would

15   ask, aspirin, get a response; then I would go on

16   to acetaminophen and give an example, such as

17   Tylenol; anti-inflammatories, such as Advil,

18   Motrin, Naprosyn, or Feldene; blood thinners, such

19   as Coumadin; asthma medications, an inhaler,

20   Theophylline, or Prednisone; medications for

21   depression, such as Marplan, Nardil, or Parnate;

22   or hemorrhoidal preparations.

23        Q.    And her answer for all of those

24   questions as to those medications being taken or

1    not was what?

2             A.    No.

3             Q.    She had not taken them?

4             A.    That's what this indicates.

5             Q.    With respect to the questionnaire,

6    were there questions asked about other types of

7    either caffeine use, alcohol use, other medical

8    conditions?

9             A.    There were questions about caffeine

10   use, alcohol use, tobacco use, street drug use,

11   which was prior to that, weight and eating

12   behaviors, family history, medical history,

13   gynecological history, socioeconomic information.

14            Q.    And with respect to those questions,

15   you just leafed through the pages, did you find

16   that she answered all of your questions and you

17   noted the answers to the questions?

18            A.    It will take me a minute to see if

19   she answered all.

20            MS. ABARAY:  Objection, overbroad,

21   vague.  The document speaks for itself.

22            A.    There is one question she did not

23   answer or she answered with a don't know, and that

24   is the question about the household income.

41

1         A.   Yes.

2         Q.   And when did you interview

3 Mr. Silvey?

4         A.   February 14th, 1998.

5         Q.   And do you have a time that the

6 interview was conducted?

7         A.   10:05 a.m. it started.

8         Q.   And did you do this in a

9 face-to-face interview?

10        A.   Wait a second here.  Yes.  It says

11 subject's home.

12        Q.   So you would have done this

13 interview of Mr. Silvey at his home?

14        A.   Yes.

15        Q.   During the course of the interview

16 of Mr. Silvey you also filled out a questionnaire?

17        A.   Yes.

18        Q.   And the questionnaire records his

19 responses to you of the questions that you asked

20 about his wife?

21        A.   Correct.

22        Q.   Would you tell us, did you ask

23 about, Mr. Silvey any questions about whether his

24 wife had had any illness in the weeks leading up

42

1    to her stroke?

2          A.    I asked specific questions, "First I

3    would like to ask you about some common illness

4    symptoms.  Do you recall," I would have inserted

5    her name, "having a cough anytime during this

6    two-week period?"  And I would also have asked

7    about the runny nose, nasal congestion, sore

8    throat, and headache.

9          Q.    So we understand, then, you would

10   have specifically asked Mr. Silvey do you recall

11   your wife, Mrs. Silvey, having a cough at any time

12   during the two weeks before her stroke, that's the

13   question you would have asked?

14         A.    Do you recall, and I would have

15   probably said Pam or Pamela, having a cough at any

16   time during this two-week period.

17         Q.    What did he -- And the two-week

18   period is when?

19         A.    The two-week period is the index

20   date and the two weeks prior to the period of the

21   index date as indicated on the calendar.

22         Q.    And what did he say to that?

23         A.    No.

24         Q.    What did he say when you asked the

43

1    question about whether he recalled her having a

2    runny nose?

3         A.   No.

4         Q.   What about, what did he answer to

5    you when you asked the question about nasal

6    congestion?

7         A.   No.

8         Q.   What about sore throat?

9         A.   No.

10        Q.   Or headache?

11        A.   No.

12        Q.   Did Mr. Silvey indicate that his

13   wife or recall that his wife had taken any

14   medication during that two-week period of time?

15        A.   This indicates that none was

16   recalled.

17        Q.   During the course of your interview

18   of Mr. Silvey, did you ask him questions similar

19   to the questions that you had asked Mrs. Silvey in

20   the hospital about caffeine use, alcohol use,

21   tobacco use, and medical history?

22        A.   Yes.

23        Q.   Did he answer all of your questions?

24        A.   He didn't know the response to

45

1          A.    Yes.

2          Q.    And did you note whether there was

3    any missing information with respect to the

4    interview?

5          A.    I indicated yes, interview completed

6    with little, and again less than one-tenth or no

7    missing information.

8          Q.    Nurse Sauerbeck, once these

9    questionnaires were completed, you had completed

10   your interview of he Mrs. Silvey and completed the

11   interview of Mr. Silvey, what would be the process

12   or the protocol for sending on the questionnaire

13   forms, what would you do with these?

14         A.    I can't remember the exact details,

15   I think we batched them periodically and sent them

16   on to Yale University for editing and data entry.

17         Q.    At that point in time would you have

18   had any further involvement or contact with either

19   Mrs. Silvey or Mr. Silvey?

20         A.    In the context of this study, no.

21         Q.    In the context of this study.  Did

22   you have any contact with them in any other

23   context?

24         A.    Yes.

46

1          Q.    Okay.  And what was the nature of

2    that?

3                    MR. ATKINS:  Let's go off the

4    record.

5                    MR. TUCKER:  We're off the record.

6                    THE VIDEOGRAPHER:  Just a moment,

7    we are off the record at 3:18.

8                                (Off the record.)

9                    THE VIDEOGRAPHER:  We are on the

10   record at 3:19.

11   BY MR. TUCKER:

12          Q.    Yes.

13          A.    In the context of another study they

14   were involved in, I did have contact in a three

15   and a six-month period.

16          Q.    And that also entailed a study on

17   strokes?

18          A.    Yes.

19                    MS. ABARAY:  I'm going to enter on

20   objection.  The Court ordered that this deposition

21   was to be limited to the Yale study.

22                    MR. TUCKER:  I'm not going to

23   inquire about the other study.  I was just asking

24   if she had any further contact.

49

1    use of phenylpropanolamine, a medication found in

2    appetite suppressants and in some cough/cold

3    preparations, may be associated with the

4    development of a brain hemorrhage."

5              Q.    And why don't you read for the

6    record, please, just that next sentence.

7              A.    "As you recall, detailed questions

8    about medications were asked at the time you were

9    evaluated and similar questions were asked of

10   persons in the community of similar age, gender,

11   race who did not have a hemorrhage."

12             Q.    And then the letter goes on to speak

13   about an article that was under review by the New

14   England Journal of Medicine and then actions being

15   reviewed by the FDA; am I right about that?

16             A.    Yes.

17             Q.    Now, we've marked as Exhibit 2 the

18   notebook of information that you have in front of

19   you there, and that notebook contains the

20   questionnaires and the responses for Mr. and Mrs.

21   Silvey that we've just gone through --

22             A.    Yes.

23             Q.    -- am I right about that?  The

24   questionnaires that were filled out by you after

50

1    interviewing Mrs. Silvey does not indicate that

2    she was taking any medication at the time of the

3    index event; am I right about that?

4            A.    Yes.

5            Q.    Or the two weeks before; am I right?

6            A.    Yes.

7            Q.    The interview of her proxy,

8    Mr. Silvey, does not show that she had been taking

9    any medication in the two weeks preceding the

10   index event; am I right about that?

11           A.    Yes.

12           Q.    This letter, Exhibit 3, when it was

13   sent to Mrs. Silvey, was not being sent to her

14   because she had taken medication containing PPA

15   prior to her stroke, was it?

16               MS. ABARAY:  Objection, leading.

17           Q.    That was not the purpose of the

18   letter?

19               MS. ABARAY:  Leading.

20           A.    The purpose was to inform them of

21   the results of the study that they participated

22   in.

23           Q.    But someone receiving this letter

24   was not supposed to believe that they had actually

52

1          A.    Correct.

2          Q.    Based upon the questionnaire and the

3    information that was obtained from Mrs. Silvey,

4    she gave you information that would conclude that

5    she was an unexposed case for the study, correct?

6              MS. ABARAY:  Objection, leading.

7          A.    I was not involved with the analysis

8    or making those determinations.  My involvement

9    was to ask the questions.

10         Q.    But the information that she gave

11   you did not indicate an exposure to PPA?

12         A.    It did not indicate that she was on

13   any medications.

14         Q.    Okay.  And the proxy confirmed that,

15   her husband confirmed that in his interview,

16   correct?

17             MS. ABARAY:  Objection, leading.

18         Q.    Let me rephrase the question.  Did

19   her husband confirm his wife's responses?

20             MS. ABARAY:  Objection.

21         A.    I didn't ask him about his wife's

22   responses.  I asked him his -- what he remembered.

23         Q.    And were they consistent from the

24   standpoint that he did not recall her taking

53

1    medication?

2                A.    Yes.

3                Q.    Now, you and I have never met

4    before, just before we started this about 50

5    minutes ago; am I right about that?

6                A.    Not that I recall.

7                Q.    You know that Mrs. Silvey is being

8    represented by Mrs. Abaray?

9                A.    Yes.

10               Q.    And you have met Mrs. Abaray before;

11   am I right about that?

12               A.    Yes.

13               Q.    Did you know before today that

14   Mrs. Abaray was representing Mrs. Silvey in this

15   case?

16               A.    Not until I received a subpoena.

17               Q.    That was the first time that you

18   learned that Mrs. Abaray was representing

19   Mrs. Silvey?

20               A.    That's the first time I learned

21   anything about this particular lawsuit.

22               Q.    Okay.  Finding out that Mrs. Abaray

23   was representing Mrs. Silvey, did you have an

24   opportunity to speak to her about the claim that's

60

1          Q.    Okay.  Would you tell us what

2   hospital?

3          A.    Good Samaritan Hospital.

4          Q.    And does it provide you with

5   information as to it being a trauma admission

6   history and physical?

7          A.    Correct.

8          Q.    Would you tell us, please, what does

9   it say with respect to medications?

10         A.    None.

11         Q.    Do you have any information other

12  than the questionnaire information you obtained

13  directly from Mrs. Silvey, the questionnaire

14  information you received directly from Mr. Silvey,

15  or these medical records which would suggest or

16  provide evidence that Mr., that Mrs. Silvey, I'm

17  sorry, was using medication in the period of time

18  shortly prior to her stroke?

19         A.    I do not.

20              MR. TUCKER:  Thank you very much.

21  Nothing further.

22              MS. ABARAY:  Thank you,

23  Ms. Sauerbeck, I would just like to follow up if I

24  could very quickly.  I'm sorry that we're imposing

78

1  Mrs. Silvey?

2          A.    I cannot recall the specific

3  interview, but unless somebody listed a

4  medication, the product ID book was not shown.

5          Q.    And she didn't indicate that she had

6  taken any medication, correct?

7          A.    Correct.

8          Q.    And her husband didn't indicate that

9  she had taken any medication, correct?

10          A.    Correct.

11          MR. TUCKER:  The Court told us that

12  we had an hour to ask you questions, we've taken a

13  little bit more of your time than that, so I will

14  stop at this point.  Thank you very much.

15          MS. ABARAY:  Thank you.  Could I

16  just ask one more quick question.

17              FURTHER EXAMINATION

18  BY MS. ABARAY:

19          Q.    Looking back at Form 2, which is the

20  case evaluation form.

21          A.    Yes.

22          Q.    There's a column for yes, no, and

23  then NM; do you see that?

24          A.    Not mentioned.

86

```
 1              C E R T I F I C A T E

 2    STATE OF KENTUCKY       :

 3                            :  SS

 4    STATE AT LARGE          :

 5         I, LOIS A. ROELL, RMR, the undersigned, a

 6    duly qualified and commissioned notary public

 7    within and for the State of Kentucky, do hereby

 8    certify that before the giving of her aforesaid

 9    deposition, the said LAURA R. SAUERBECK, R.N., was

10    by me first duly sworn to tell the truth, the

11    whole truth and nothing but the truth; that the

12    foregoing is the deposition given at said time and

13    place by the said LAURA R. SAUERBECK, R.N.; that

14    said deposition was taken in all respects pursuant

15    to Subpoena and Notice to Take Deposition; that

16    said deposition was taken by me in stenotypy and

17    transcribed by computer-aided transcription under

18    my supervision; that the transcribed deposition is

19    to be submitted to the witness for her examination

20    and signature; that I am neither a relative of nor

21    attorney for any of the parties to this cause, nor

22    relative of nor employee for any of their counsel,

23    and have no interest whatever in the result of the

24    action.
```

87

1          IN WITNESS WHEREOF, I hereunto set my

2    hand and official seal of office at Cincinnati,

3    Ohio, this        day of                , 2003.

4

5

6

7    MY COMMISSION EXPIRES:  LOIS A. ROELL, RMR

8    SEPTEMBER 7, 2003.        NOTARY PUBLIC-STATE OF

9                             KENTUCKY

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

88

1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF OHIO
2                         WESTERN DIVISION
                           -    -    -
3    PAMELA S. SILVEY,               :
     AND KENNETH E. SILVEY,          :
4                   PLAINTIFFS,      :
     -VS-                            :  CASE NO. C-1-01-164
5    SMITHKLINE BEECHAM              :
     CORPORATION,                    :
6                   DEFENDANT.       :
                           -    -    -
7

8          Lois A. Roell, RMR, a court reporter,
     first duly cautioned and sworn, testifies and
9    affirms that LAURA R. SAUERBECK, R.N., a witness
     herein, was notified that the transcript was ready
10   for review and signature on March 17, 2003, by
     forwarding a copy of the transcript to Jason
11   Atkins, Esq.

12         Within thirty-one days (pursuant to Rule
     (30)E of the Federal Rules of Civil Procedure),
13   LAURA R. SAUERBECK, R.N., a witness herein, did
     not present signature of said deposition.

14         The original transcript is now being
     tendered into the hands of Edward E. Taber, Esq.
15

16         Further affiant sayeth naught.

17
                         _____
18                       Lois A. Roell, RMR

19   Sworn to me and subscribed in my presence this
     day of                 , 2003.

20
                         _____
21                       Susan M. Sharp
                         Notary Public:  State of Ohio
22                       My commission expires:
                         08/04/2004
23

24

**L**

THE HONORABLE BARBARA J. ROTHSTEIN

1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9  IN RE: PHENYLPROPANOLAMINE (PPA) )
10  PRODUCTS LIABILITY LITIGATION,       )        MDL DOCKET #1407
                                         )
11  _____  )        **FINAL MDL PRETRIAL ORDER**
    This document relates to all actions identified )
12  in Exhibit A.                        )
                                         )
13                                       )

14                    **FINAL MDL PRETRIAL ORDER**

15       This Final MDL Pretrial Order describes the events that have taken place in

16  MDL 1407 and those items that require further action by the transferor court. A copy of this

17  Final MDL Pretrial Order, along with the case file and materials, will be provided to the

18  transferor court.

19                          **I. INTRODUCTION**

20       On August 28, 2001, the Judicial Panel for Multidistrict Litigation ("JPML")

21  designated this Court as the transferee court for all individual, consumer class action and other

22  federal cases arising out of the sale or use of over-the-counter cough/cold and appetite

23  suppressant products containing phenylpropanolamine ("PPA") for pre-trial consolidation and

24  coordination. *In re: Phenylpropanolamine ("PPA") Products Liability Litigation*, MDL

25  No. 1407.

26

**FINAL MDL PRETRIAL ORDER** - 1

Case No. 01-CV-1407
019186.0033/1099168.1

The proceedings in this MDL 1407 began in earnest with the Order re: Initial Conference dated November 1, 2001, requiring plaintiffs and defendants to submit proposed committee rosters, and scheduling the initial conference for November 16, 2001. Since then: (1) generic fact discovery has been completed or substantially completed as to most MDL defendants (including written discovery, document production and review, discovery depositions, and requests for admissions); (2) a procedure for case-specific fact discovery in each case has been implemented, and discovery has been underway since 2002; (3) Rule 26 disclosures of generic experts have been made, the discovery depositions of those experts have been completed, and a process to permit the adoption of those experts' opinions in other cases transferred or being transferred to this MDL has been adopted; (4) trial preservation depositions of several of plaintiffs' and defendants' generic experts are underway or have been taken; and (5) the Court has resolved *Daubert* motions challenging plaintiffs' expert opinions solely as to general causation.

Given the foregoing, the Court is satisfied that this MDL has sufficiently matured and the Court has issued a Suggestion of Remand for the cases listed on Exhibit A to facilitate their remand by the JPML to their transferor courts for further case-specific proceedings, including designation and discovery of case-specific experts, independent medical examinations, pre-trial motion practice and final disposition. Below is a more detailed overview of the proceedings in MDL 1407 to date.

## II. ADMINISTRATION OF CASES

A.    **Lead and Liaison Counsel.**

By order entered on November 20, 2001, this Court appointed and assigned certain responsibilities to Lead and Liaison Counsel for Plaintiffs and Defendants. (Order Appointing Lead and Liaison Counsel (signed Nov. 19, 2001, entered Nov. 20, 2001). The responsibilities of each are delineated in Memorandum in Support of Proposed Language

**FINAL MDL PRETRIAL ORDER - 2**

Case No. 01-CV-1407
019186.0033/1099168.1

LANE POWELL SPEARS LUBERSKY LLP
SUITE 4100
1420 FIFTH AVENUE
SEATTLE, WA 98101
(206) 223-7000

have an opportunity to object that the case is not "ripe for remand." Magistrate Judge Theiler will resolve any such objections and thereafter issue an order listing all cases "eligible for remand." The parties are then permitted to submit memorandum on cases deemed eligible for remand concerning why a case should or should not be remanded on issues other than discovery status. The Court subsequently issues a Preliminary Order selecting cases for remand from the pool of those deemed eligible by Magistrate Theiler. This Preliminary Order triggers the mediation requirements of CMO 18A. (*See infra* Part V.D.).

**B.    Suggestion of Remand Orders.**

Following the Preliminary Order (*see supra* Part V.A.), the Court issues a Suggestion of Remand Order which is forwarded to the JPML. (CMO 17B). The Court will order the initiation of an ongoing remand program consisting of a series of consecutively numbered Suggestion of Remand Orders, in which the Court will suggest that the JPML remand designated civil actions to their respective transferor courts. The Court will also designate this order, along with any supplements and/or amendments thereto, as the Final Pretrial Order in all cases that the Court suggests for remand. (CMO 17B).

**C.    Remaining Discovery After Remand.**

Case-specific expert discovery has been deferred pending remand. The transferor court has jurisdiction over setting the case-specific expert discovery schedule, any other case-specific discovery and any other pre-trial matters not addressed by this Court. (*See supra* Part III.C.3.).

**D.    MDL Mediation Requirement.**

Within seven (7) days of a case being named on the Court's Preliminary Order regarding remand (*see supra* Part V.A.), the parties are to notify the Court whether they intend to mediate the case per CMO 18A in a submission entitled "Election Regarding Alternative Dispute Resolution." If the parties elect to mediate, the mediation is to take place within one month after the selection of the case for remand. If the parties choose not to

**FINAL MDL PRETRIAL ORDER - 12**

LANE POWELL SPEARS LUBERSKY LLP
SUITE 4100
1420 FIFTH AVENUE
SEATTLE, WA 98101
(206) 223-7000

mediate, they are required to conduct a meet and confer conference with Special Master Professor Francis McGovern within 21 days of the Court's Preliminary Order. (CMO 18A). This Court appointed Professor McGovern as a Special Master to assist the Court in coordinating case management matters between the MDL litigation and the matters pending in state courts. (Order Jan. 17, 2002). The mediation requirements of CMO 18A do not preclude mediations after remand.

The parties have agreed upon a number of mediators from the following areas: California, Texas, Louisiana, Alabama, Mississippi, North Carolina, South Carolina, Tennessee, Northeast, Midwest and Northwest. Nothing in CMO 18A prevents the parties from agreeing to mediate any additional cases or groups of cases. (CMO 18A).

## VI. SUMMARY OF ACTIVITIES UPON REMAND

The following activities remain to be completed upon remand of the cases listed on Exhibit A and include but are not limited to:

- Case-specific expert designation and discovery;
- Independent medical examinations;
- Obtain updated medical records and, upon a showing of good cause and necessity, updating the plaintiff's deposition, and/or deposing additional or newly identified fact witnesses. In the event good cause and necessity is shown to update the plaintiff's deposition, shortened time limits may be imposed, depending on the circumstances;
- Pending case-specific motions;
- Pre-trial motion practice, including specific causation motions; and,
- Final disposition.

## VII. DOCUMENTS TO BE SENT TO TRANSFEROR COURT

The clerk of the transferee court will forward to the transferor court (electronically where feasible) a copy of: (1) this Pretrial Order and attachments; (2) the docket sheet for the

**FINAL MDL PRETRIAL ORDER** - 13

Case No. 01-CV-1407
019186.0033/1099168.1

LANE POWELL SPEARS LUBERSKY LLP
SUITE 4100
1420 FIFTH AVENUE
SEATTLE, WA 98101
(206) 223-7000

# UNITED STATES OF AMERICA
## JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

CHAIRMAN:
Judge Wm. Terrell Hodges
United States District Court
Middle District of Florida

MEMBERS:
Judge John F. Keenan
United States District Court
Southern District of New York

Judge Bruce M. Selya
United States Court of Appeals
First Circuit

Judge D. Lowell Jensen
United States District Court
Northern District of California

Judge J. Frederick Motz
United States District Court
District of Maryland

Judge Robert L. Miller, Jr.
United States District Court
Northern District of Indiana

Judge Kathryn H. Vratil
United States District Court
District of Kansas

DIRECT REPLY TO:

Michael J. Beck
Clerk of the Panel
One Columbus Circle, NE
Thurgood Marshall Federal
Judiciary Building
Room G-255, North Lobby
Washington, D.C. 20002

Telephone: [202] 502-2800
Fax:         [202] 502-2888

http://www.jpml.uscourts.gov

May 13, 2004

Bruce Rifkin, Clerk
215 William Kenzo Nakamura
 U.S Courthouse
1010 Fifth Avenue
Seattle, WA 98104-1130

Re:  MDL-1407 -- In re Phenylpropanolamine (PPA) Products Liability Litigation

(See Attached Schedule of Actions)

Dear Mr. Rifkin:

    I am enclosing a certified copy and additional copies of a conditional remand order filed on April 27, 2004. The order was entered pursuant to 28 U.S.C. § 1407(a) which provides that "[E]ach action so transferred by the Panel shall be remanded by the Panel at or before the conclusion of such pretrial proceedings to the district from which it was transferred...."

    Please note that transmittal of the order was stayed fifteen (15) days to give any party opposing remand an opportunity to file such opposition. The fifteen-day period has now elapsed, no opposition has been received, and the order is being sent to you for filing.

    Pursuant to Rule 7.6(g) of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, 199 F.R.D. 425, 438 (2001), parties are to furnish you with a stipulation or designation of the contents of the record to be remanded and all necessary copies of any pleading or other matter filed to enable you to comply with the remand order.

Very truly,

Michael J. Beck
Clerk of the Panel

By _____
            Deputy Clerk

Enclosures

cc:    Transferee Judge:    Judge Barbara Jacobs Rothstein
       Transferor Clerks:   David J. Maland, James R. Manspeaker, Jeffrey A. Apperson, Karen S. Mitchell,
                            Kenneth J. Murphy, Kevin F. Rowe, Lance S. Wilson, Laura A. Briggs,
                            Lawrence Talamo, Leslie G. Whitmer, Markus B. Zimmer, Michael N. Milby,
                            Richard H. Weare, Richard Sletten, Robert H. Shemwell, Tony Anastas

JPML Form 41

# EXHIBIT A

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

APR 27 2004

FILED
CLERK'S OFFICE

### DOCKET NO. 1407

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

## IN RE PHENYLPROPANOLAMINE (PPA) PRODUCTS LIABILITY LITIGATION

### (SEE ATTACHED SCHEDULE )

### CONDITIONAL REMAND ORDER

The transferee court in this litigation has advised the Panel that coordinated or consolidated pretrial proceedings in the actions listed on the attached schedule assigned to it have been completed and that remand of the actions to the transferor courts, as provided in 28 U.S.C. §1407(a), is appropriate.

IT IS THEREFORE ORDERED that the actions on the attached schedule be remanded to their respective transferor courts.

IT IS ALSO ORDERED that pursuant to Rule 7.6 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, 199 F.R.D. 425, 436-38 (2001), the transmittal of this order to the transferee clerk for filing shall be stayed fifteen days from the date of this order and if any party files a Notice of Opposition with the Clerk of the Panel within this fifteen-day period, the stay will be continued until further order of the Panel. This order does not become effective until it is filed in the office of the Clerk for the United States District Court for the Western District of Washington.

IT IS FURTHER ORDERED that, pursuant to Rule 7.6(g), R.P.J.P.M.L., and coinciding with the effective date of this order, the parties shall furnish the Clerk for the Western District of Washington with a stipulation or designation of the contents of the record to be remanded and furnish said Clerk all necessary copies of any pleadings or other matter filed so as to enable said Clerk to comply with the order of remand.

FOR THE PANEL:

*Michael J. Beck*

Michael J. Beck
Clerk of the Panel

Inasmuch as no objection is
pending at this time, the
stay is lifted.

MAY 13 2004

CLERK'S OFFICE
JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

## SCHEDULE FOR CONDITIONAL REMAND ORDER
## DOCKET NO. 1407
## IN RE PHENYLPROPANOLAMINE (PPA) PRODUCTS LIABILITY LITIGATION

| --- TRANSFEREE --- | | | — TRANSFEROR — | | | |
|---|---|---|---|---|---|---|
| DIST. | DIV. | C.A.NO. | DIST. | DIV. | C.A.NO. | CASE CAPTION |
| WAW | 2 | 02-420 | AZ | 2 | 01-156 | Melissa Ann Kobar, etc. v. Novartis Corp., et al. |
| WAW | 2 | 03-1390 | CAN | 3 | 01-4181 | Sandra Mustoe v. Bayer Corp. |
| WAW | 2 | 02-904 | CO | 1 | 02-240 | Sharon K. Roberts-Weisner, et al. v. Whitehall-Robins Healthcare, et al. |
| WAW | 2 | 02-21 | CT | 3 | 01-2093 | Ronald B. Lewis, et al. v. GlaxoSmithKline, PLC, et al. |
| WAW | 2 | 02-1168 | INS | 4 | 02-47 | Tracy Patton v. Novartis Consumer Health, Inc. |
| WAW | 2 | 01-2137 | KYE | 2 | 01-199 | Sharon Ann Carter v. Bayer Corp. |
| WAW | 2 | 02-1272 | KYW | 1 | 01-182 | Gerald Jones, et al. v. Perrigo Co., et al. |
| WAW | 2 | 02-538 | KYW | 4 | 01-213 | Rhonda Bailey v. Schering-Plough Healthcare Products, Inc. |
| WAW | 2 | 02-29 | LAM | 3 | 01-1025 | Eleanor D. Beattie, et al. v. Novartis Consumer Health, Inc., et al. |
| WAW | 2 | 01-2164 | LAW | 3 | 01-2195 | James Quarrels, et al. v. Bayer Corp. |
| WAW | 2 | 01-2100 | LAW | 5 | 01-1981 | Nathaniel Williams v. GlaxoSmithKline, et al. |
| WAW | 2 | 01-2026 | LAW | 5 | 01-2018 | Londell Bell, Jr. v. Bayer Corp., et al. |
| WAW | 2 | 01-2166 | LAW | 5 | 01-2217 | Perry Robinson, et al. v. Bayer Corp., et al. |
| WAW | 2 | 01-2167 | LAW | 5 | 01-2219 | Lurline McKinney, et al. v. Bayer Corp., et al. |
| WAW | 2 | 02-1020 | LAW | 5 | 02-363 | Stephanie Lambert, et al. v. Bayer Corp. |
| WAW | 2 | 01-2172 | LAW | 6 | 01-2196 | Dennis Romero, et al. v. Bayer Corp. |
| WAW | 2 | 01-1405 | MA | 1 | 01-10324 | Alexander P. Ziolkowski, etc. v. Novartis Consumer Health, Inc., et al. |
| WAW | 2 | 01-1406 | MA | 1 | 01-10325 | Stacey Kerrigan, et al. v. Whitehall-Robins, et al. |
| WAW | 2 | 02-1863 | MN | 0 | 02-1268 | Daniel S. Goettsch v. SmithKline Beecham Consumer Healthcare, et al. |
| WAW | 2 | 03-2093 | MSS | 4 | 01-169 | Barbara A. Lupo v. Bayer Corp., et al. |
| WAW | 2 | 02-278 | NV | 2 | 01-1345 | Charles Newman, et al. v. American Home Products Corp., et al. |
| WAW | 2 | 01-1654 | OHS | 1 | 01-164 | Pamela S. Silvey, et al. v. Smithkline Beecham Corp. |
| WAW | 2 | 02-364 | OHS | 1 | 01-755 | Lynne M. Nill, et al. v. Perrigo Sales Corp. |
| WAW | 2 | 01-2182 | OHS | 3 | 01-447 | John Tuwiler, et al. v. Novartis Pharmaceuticals Corp. |
| WAW | 2 | 01-2227 | TXE | 4 | 01-338 | Nina W. Hastings, et al. v. Novartis AG, et al. |
| WAW | 2 | 01-1656 | TXN | 5 | 01-166 | Bettye Lou Taylor, et al. v. Bayer Corp., et al. |
| WAW | 2 | 02-918 | TXS | 4 | 01-3795 | Bernadette Massey, et al. v. Sandoz Pharmaceutical Corp., et al. |
| WAW | 2 | 02-373 | UT | 2 | 01-985 | Lynette Fisk, et al. v. Novartis AG, et al. |