# EXHIBIT B

1

1                  UNITED STATES DISTRICT COURT

2                   SOUTHERN DISTRICT OF OHIO

3                       WESTERN DIVISION

4                        -    -    -

5       PAMELA S. SILVEY AND       :

6       KENNETH E. SILVEY,         :

7                  PLAINTIFFS,     :

8         -VS-                     :   CASE NO. C-1-01-164

9       SMITHKLINE BEECHAM         :

10      CORPORATION,               :

11                  DEFENDANT.     :

12                        --   -    -

13                  UNITED STATES DISTRICT COURT

14              WESTERN DISTRICT OF WASHINGTON

15                        AT SEATTLE

16      -  -  -  -  -  -  -  -  -  -  -  -  -  -  -

17      IN RE PHENYLPROPANOLAMINE (PPA) :

18      PRODUCTS LIABILITY LITIGATION   :   MDL NO. 1407

19      -  -  -  -  -  -  -  -  -  -  -  -  -  -  -

20              Deposition of PAMELA SUE SILVEY, a

21      plaintiff herein, taken by the defendant as upon

22      cross-examination pursuant to the Federal Rules of

23      Civil Procedure and pursuant to Notice to Take

24      Deposition and stipulations hereinafter set forth

2

1    at the offices of Lopez, Hodes, Restaino, Millman

2    & Skikos, 312 Walnut Street, Suite 2090,

3    Cincinnati, Ohio, at 12:42 p.m. on Wednesday,

4    December 18, 2002, before Lois A. Roell, RMR, a

5    notary public within and for the State of

6    Kentucky, and also by audiovisual means before

7    Susan M. Sharp.

8                              -    -    -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

3

```
1    APPEARANCES:

2       On behalf of the Plaintiffs:

3              Calvin S. Tregre, Jr., Esq.

4                     of

5              Lopez, Hodes, Restaino, Millman & Skikos

6              312 Walnut Street, Suite 2090

7              Cincinnati, Ohio  45202

8       On behalf of the Defendant:

9              Edward E. Taber, Esq.

10                     of

11             Arter & Hadden, LLP

12             1100 Huntington Building

13             925 Euclid Avenue

14             Cleveland, Ohio  44115-1475

15                    -   -   -

16              S T I P U L A T I O N S

17             It is stipulated by and between counsel

18   for the respective parties that the deposition of

19   PAMELA SUE SILVEY, a plaintiff herein, may be

20   taken as upon cross-examination pursuant to the

21   Federal Rules of Civil Procedure and pursuant to

22   Notice to Take Deposition; that the deposition may

23   be taken by audiovisual means by the videographer

24   and in stenotypy by the notary public-court
```

4

1    reporter and transcribed by her out of the

2    presence of the witness; that the jurisdiction of

3    the notary public is waived; that the transcribed

4    deposition is to be submitted to the witness for

5    her examination and signature, and that signature

6    may be affixed out of the presence of the notary

7    public-court reporter.

8                            -   -   -

9                          I N D E X

10   WITNESS                CROSS-EXAMINATION   EXAMINATION

11   Pamela Sue Silvey         7                 315

12                            -   -   -

13                      E X H I B I T S

14   DEFENDANT'S EXHIBITS                          MARKED

15   No. 1, a 9-page document, the first page       10

16       a letter to Janet G. Abaray from

17       Edward E. Taber dated November 26, 2002,

18       with attached Notice of Discovery

19       Deposition Duces Tecum of Pamela S.

20       Silvey and Kenneth Silvey.

21   No. 2, a multi-page document entitled          24

22       "Plaintiff's Fact Sheet."

23   No. 3, a letter to Bill Edge from Hal R.       59

24       Arenstein dated April 18, 1996.

17

1          A.    Yes.

2          Q.    All right.  What all have you given

3    to them?

4          A.    A copy of the medical bills, you

5    know, they got that from the hospital.

6          Q.    All right.

7          A.    The only letter that I received from

8    the study.

9          Q.    Is that from Dr. Broderick's study?

10         A.    Uh-huh.  I didn't know I was in that

11   study.

12         Q.    You do remember filling out a

13   consent form for that study in '98, don't you?

14         A.    No.

15         Q.    All right.  We'll go into that a

16   little bit later because I do have copies of that

17   for you to review.  What did the letter say?  I

18   think the study had to do with genetic

19   predisposition to stroke and/or hypertension; is

20   that true?

21               MR. TREGRE:  Objection.

22         A.    They wanted to let me know that I

23   was in the study and thanked me for being in it.

24         Q.    All right.  And what else did that

18

1    say?

2              A.    That they had linked, you know, PPA

3    to hemorrhagic strokes.

4              Q.    The study related to PPA?

5              A.    Uh-huh.

6              Q.    When I said Dr. Broderick, that was

7    a separate study that I was referencing.  Is

8    Dr. Broderick the study that you're thinking

9    about?

10             A.    Uh-huh.  It was from the University

11   Hospital.

12             Q.    All right.  When did you receive

13   this letter?

14             A.    I think it was October of 2000.

15             Q.    And was this a one-page document?

16             A.    It was like a page and just a

17   paragraph.

18             Q.    Did it say any other link that they

19   suspected in there to your stroke, such as the

20   genetic marker that they were studying?

21             A.    Huh-uh.

22             MR. TABER:    All right.  Calvin, do

23   you know if you have a copy of that letter?

24             MR. TREGRE:    Honestly, I don't.

94

1    connect it with anything.

2            Q.    Did you connect it before that

3    possibly with anything that would not have given

4    you any ability to file a lawsuit?

5            MR. TREGRE:  Objection.

6        A.    No.

7            Q.    Did you ever have an understanding

8    before November of 2000 of what may have led to

9    your stroke?

10       A.    No.

11           Q.    You had no idea?

12       A.    (Shaking head.)

13           MR. TREGRE:  Objection.

14       A.    No.

15           Q.    And how -- After you got the letter,

16   tell me what your thoughts were and what you did.

17           MR. TREGRE:  Objection.

18       A.    Well, after I got the letter, you

19   know, I discussed it with my husband, and that's

20   when I called a lawyer.

21           Q.    And was Calvin's firm, the Lopez

22   firm, the first firm that you called?

23       A.    Yes.

24           Q.    How do you get their name?

95

1          A.    Well, I called -- I think it was on

2     TV.

3          Q.    There was a television ad for their

4     firm that you got the phone number from?

5          A.    Yes.

6          Q.    Did the ad have anything to do with

7     PPA or was it just generically the firm?

8          A.    No, it was a PPA litigation.

9          Q.    Did the ad say that if you've had a

10    stroke, something of that nature?

11         A.    Yes.

12         Q.    And you had received the letter

13    before the time you saw that?

14         A.    Yes.

15         Q.    When did you first come to hear

16    about PPA?

17         A.    When I got the letter in the mail

18    about the study.

19         Q.    Well, did you fill out a

20    questionnaire for the study before you got the

21    letter?

22         A.    No.

23         Q.    How did someone in the letter know

24    that you had taken PPA?

100

1        A.    No, I do not.

2        Q.    Did you ever talk to your husband

3    before November of 2000 about this study or

4    anything relative to this study?

5        A.    I didn't even know anything about

6    this study.  Because he said that he thought it

7    was people, you know, from Good Samaritan.  He

8    didn't know where they was from.  Maybe I signed

9    this and don't even remember it.

10        Q.    Well, what do you remember before

11    November of 2000 about what had been, what study

12    you had been involved in?

13              MR. TREGRE:  Objection.

14        Q.    If anything?

15        A.    Nothing.  Because, you know, when I

16    got that letter, you know, thanking me for being

17    in this study, I wanted to know what study.

18        Q.    All right.  In the study it

19    references a questionnaire, it says you will be

20    asked to fill out a questionnaire.  Do you ever

21    remember filling out such a questionnaire?

22              MR. TREGRE:  Objection.

23        A.    No.

24        Q.    Did you ever see any -- When do you

101

1    think you saw the ad for the Lopez firm that

2    discussed PPA litigation?

3                    MR. TREGRE:  Objection.

4            A.    That was after I received the

5    letter.

6            Q.    All right.  Had you ever heard about

7    PPA, whether it be newspaper articles like you

8    discussed before, other TV, or discussions with

9    any physicians before November of 2000?

10                   MR. TREGRE:  Objection.

11           A.    No.

12           Q.    Had you ever discussed the cause of

13   your stroke with Dr. VanLoveren?

14           A.    No.

15           Q.    Had you ever discussed the possible

16   causes of your stroke with any doctor before

17   November of 2000?

18           A.    No.

19           Q.    Had you ever asked what caused you

20   to have a stroke?

21           A.    They said maybe I was just born

22   with, you know, an aneurysm.

23           Q.    Who told you that?

24           A.    Dr. Sway.

121

1          A.   Well, I wanted to get something

2    stronger because I was up for suspension again

3    for, you know, absenteeism, and I'd already used

4    one E day, and I didn't want to use -- you know, E

5    days is vacation days you can call in for, and I

6    didn't want to use all my vacation days for being

7    sick.  So I thought, well, I'm going to get

8    something a little bit stronger, and I seen that,

9    and so I bought that, and I thought, oh, that will

10   knock it out.

11         Q.   Are you claiming that you took a

12   maximum strength one or -- if you didn't, that's

13   fine.

14              MR. TREGRE:  Objection.

15         A.   Just a Contac 12-Hour.

16         Q.   What did you do with the package?

17         A.   Because I know my mom wanted some of

18   them, and right after I got out of the hospital, I

19   gave them to my mom, and she took them.

20         Q.   Let's take you back to your

21   purchase, and as I understand it from your PFS,

22   you bought these on January 13th of '98?

23         A.   Yes.

24              MR. TABER:  Let's go off the record

130

1          Q.    Did you consider any other

2    medications or over-the-counter products before

3    you bought that Contac?

4          A.    Just Tylenol Cold.

5          Q.    Tylenol?

6          A.    Cold.

7          Q.    Cold, okay.  You had taken Tylenol

8    in the past?

9          A.    Yes.

10          Q.    Why did you pick Contac instead of

11    Tylenol?

12          A.    I don't know.  Seemed like, you

13    know, it was a better choice.  It had more, you

14    know, it took care of more stuff.

15          Q.    Did you read --

16          A.    More symptoms.

17          Q.    Did you read the labels then?

18               MR. TREGRE:  Objection.

19          Q.    At least on the front of the box?

20          A.    Just on the front of the box.

21          Q.    What the symptoms were.  Did you

22    read the warning labels on the box before you took

23    the medication?

24               MR. TREGRE:  Objection.

131

1          A.    No.

2          Q.    I didn't hear your answer.

3          A.    The only thing I ever looked for

4    ingredients, you know, on anything is aspirin

5    because I'm allergic to aspirin.

6          Q.    I didn't hear your answer, did you

7    or did you not read the warning labels on the

8    Contac that you took in January of '98?

9          A.    No, because there wasn't, you know,

10   I know I don't have high blood pressure or

11   anything like that, so I never did read it.

12         Q.    Why do you believe that that was --

13   well, you believe it was Contac?

14         A.    Yes.

15         Q.    And I assume that's why you believe

16   it was a PPA product?

17         A.    (Nodding head.)

18              MR. TREGRE:   Objection.

19         A.    Yes.

20         Q.    Okay.   Did you buy a -- Did you buy

21   it at the pharmacy counter or the regular aisle?

22         A.    Just the regular aisle.

23         Q.    Did you buy anything else that day?

24         A.    Some orange juice.

138

1   that would --

2                    MR. TREGRE:   Objection again.

3             A.   Nothing that I can think of.

4             Q.   Do you have any other knowledge or

5   receipt or somebody you talked to or, other than

6   your lawyers obviously, that would be able to

7   confirm that you actually took this Contac

8   12-Hour?

9             A.   Other than my mother.

10            Q.   I'm sorry?

11            A.   Other than my mother.

12            Q.   What, as far as you know, what would

13  she be able to tell us?

14            A.   You know, I talked to her that night

15  and I told her I had stopped at the store because

16  she said what are you taking for it, and I said,

17  well, I stopped and got some orange juice and I

18  stopped and got some Contac 12-Hour, and she asked

19  me, you know, could she get a couple of them

20  because she was feeling bad, and I told her I

21  would bring her some over when I got time and felt

22  better.

23            Q.   Did you do that then or then you had

24  your stroke before you could do that?

139

1          A.    I had my stroke before I could do

2     that.

3          Q.    So you spoke with your mom on

4     January 13th, that night?

5          A.    Yes.

6          Q.    Do you have a specific memory of

7     that phone call or any memory?

8          A.    Yes, I remember that.

9          Q.    Did you call her just to tell her

10    you were ill or just to talk?

11         A.    Just to talk, because we talked

12    every night.

13         Q.    All right.  Is that all you can

14    remember from that phone call with your mother,

15    that she said I'll have some of that too and you

16    felt ill?

17         A.    Yes.

18         Q.    She felt ill also?

19         A.    Yes.  She said she was feeling bad.

20         Q.    Okay.  When did she dispose of the

21    last remnants of the Contac?

22         A.    I have no idea.

23         Q.    Do you know if she saved any part of

24    the box, the package insert, any of the foil

140

1    containers or whatever it's contained inside?

2        A.    No, I don't think she did.

3        Q.    Okay.   Let's talk a little bit more

4    about the product.   How was it packaged?

5        A.    In a little pop-out cellophane

6    things with the aluminum on the back.

7        Q.    With the what?

8        A.    With the aluminum foil like on the

9    back that you can pop them out.

10       Q.    How many of them did you take that

11   first day on the 13th?

12       A.    Just one.

13       Q.    And did you take a certain amount

14   because that's what the package said to take or

15   you had taken it before and you knew?

16       A.    That's what the package said, one.

17       Q.    Said take one every 12 hours?

18       A.    Yes, one every 12 hours.

19       Q.    So you took one that night and went

20   to bed?

21       A.    Yes.

22       Q.    Tell me again the color of the

23   labeling of the package.

24       A.    It was dark blue, I remember the

141

1    yellow writing and some orange writing.

2            Q.    Okay.  Any other colors that you

3    remember?

4            A.    White.

5            Q.    I'm sorry?

6            A.    I think the Contac was in white.

7            Q.    The Contac was in white, okay.  Any

8    other colors you can remember; was blue the

9    background color and the letters were white?

10           A.    Yes.  Just like a dark blue.

11           Q.    Dark blue background and white

12   letters.  What was yellow?

13           A.    Some of the words was yellow or

14   there was a line in yellow, something on it was

15   yellow.  I remember the yellow.

16           Q.    All right.  Is it possible for you

17   to separate your memory of Contac products you've

18   seen since that from the Contac you bought on the

19   13th or that you may have bought before or is it

20   all kind of blurred to you?

21           A.    Kind of blurred together.

22           Q.    All right.  What writing was on the

23   package that you can remember?  Are you sure it

24   said Contac?

149

1    confirm it, then that's what she can say, that I

2    can't confirm it

3    BY MR. TABER:

4         Q.    I need to know one way or another.

5    If you are sure, tell me you're sure; if you're

6    not sure, tell us you're not sure.

7         A.    I'm not sure.

8         Q.    I'm sorry?

9         A.    I'm not sure.

10        Q.    You're not sure of what?

11        A.    It looks more like this one, but

12   that's a caplet.  It was a capsule.

13        Q.    Which one are you pointing to?  If

14   you could read the bates number in the lower

15   right-hand corner.

16        A.    GSKP01071461.

17        Q.    All right.  Now -- so you're sure

18   you didn't take the other six that are in front of

19   you?

20             MR. TRECRE:  Objection.

21        Q.    And please, if that's true, I don't

22   want to put words in your mouth, but if that's

23   true, tell us that's true.  If it's not --

24        A.    I'm not sure.

150

1          Q.    Just the best of your memory is all

2     I ask.

3                    MR. TREGRE:  She's answered the

4     question.

5                    MR. TABER:  It's kind of an

6     important question.

7                    MR. TREGRE:  I realize that, and

8     she's answered it more than once.

9                    MR. TABER:  Well, this is a

10    different question.

11    BY MR. TABER:

12         Q.    Can you say for sure if you took any

13    of these?

14         A.    It was a capsule, not a caplet.

15         Q.    So can we confirm then, I'll ask it

16    again, please, you're under oath to give me a

17    response, can we confirm then that you've taken

18    none of the products that are pictured in front of

19    you?

20                    MR. TREGRE:  I'm going to object as

21    she has answered that question more than once,

22    more than twice.

23                    MR. TABER:  This is different.

24                    MR. TREGRE:  And at this point

151

1    you're repeating your question and it's borderline

2    harassment, and if we continue down this line, we

3    will end this deposition.

4            MR. TABER:  If she's not sure,

5    she's not sure, but I want to know if she's sure.

6    If she is sure, that's her testimony.

7    BY MR. TABER:

8        Q.    Which is it, ma'am?  With all due

9    respect, you do have to answer the question.

10            MR. TREGRE:  Objection to you

11   saying that, you continue to repeat that, and

12   that's harassment, and I'm going to end this

13   deposition if you continue doing that.

14       Q.    The question is pending.  Would you

15   please answer.

16            MR. TABER:  Would you please read

17   back the question and instruct her to answer.

18            MR. TREGRE:  If you're not sure,

19   that's what you can say.

20       A.    I'm not sure.

21       Q.    You're not sure of what?

22       A.    I'm not sure of which one it is, but

23   I do know it was a capsule, not a caplet.

24       Q.    All right.  So these are all

180

1   smoking after your stroke, right?

2          A.    Yes.

3          Q.    As of the time of the stroke, in the

4   PFS you stated that for 21 years you smoked an

5   average of a pack and a half a day?

6          A.    Not starting out.  I would say in

7   the last ten years about a pack and a half.

8          Q.    And did you smoke less on the 13th,

9   14th, or 15th than your usual amount?

10         A.    Yes, I did on the 13th and 14th.

11         Q.    Less because you felt bad?

12         A.    Yes, plus I was coughing so bad, I

13  couldn't hardly smoke.

14         Q.    What kind of cigarettes do you

15  smoke?

16         A.    Kool's Menthol.

17         Q.    Is that what you've pretty much

18  always smoked?

19         A.    Yes.

20         Q.    You started smoking at the age of

21  14?

22         A.    Yes.

23         Q.    Now, how many cigarettes would you

24  estimate you had on the 13th; if your average is a

204

1         A.    That's true.

2         Q.    Do you have any mental problems

3  or -- that you claim are caused by this stroke?

4             MR. TREGRE:  Objection.

5         A.    No.

6         Q.    I'm sorry?

7         A.    No.

8         Q.    That will save some time.  And did

9  you ever have any mental or psychiatric or

10  psychological problems that you attribute to PPA?

11            MR. TREGRE:  Objection.

12        A.    No.

13        Q.    Did anything -- well, did you ever

14  go to see the study that we talked about, you

15  don't remember the form, but they sent you a

16  letter, did you ever actually go anywhere to get

17  any test done or anything for that?

18        A.    No.

19        Q.    Did you ever sign a consent form so

20  they could get your records that you know of?

21           MR. TREGRE:  Objection.

22        A.    No, not that I know of.

23        Q.    You never talked to any of the

24  people in person at that study?

319

1                    C E R T I F I C A T E

2       STATE OF KENTUCKY       :

3                              :   SS

4       STATE AT LARGE          :

5           I, LOIS A. ROELL, RMR, the undersigned, a

6       duly qualified and commissioned notary public

7       within and for the State of Kentucky, do hereby

8       certify that before the giving of her aforesaid

9       deposition, the said PAMELA SUE SILVEY was by me

10      first duly sworn to tell the truth, the whole

11      truth and nothing but the truth; that the

12      foregoing is the deposition given at said time and

13      place by the said PAMELA SUE SILVEY; that said

14      deposition was taken in all respects pursuant to

15      Notice to Take Deposition; that said deposition

16      was taken by me in stenotypy and transcribed by

17      computer-aided transcription under my supervision;

18      that the transcribed deposition is to be submitted

19      to the witness for her examination and signature;

20      that I am neither a relative of nor attorney for

21      any of the parties to this cause, nor relative of

22      nor employee for any of their counsel, and have no

23      interest whatever in the result of the action.

24

320

1          IN WITNESS WHEREOF, I hereunto set my

2     hand and official seal of office at Cincinnati,

3     Ohio, this *25th* day of *February*        , 2003.

4

5

6                              *Lois A. Roell*

7     MY COMMISSION EXPIRES:   LOIS A. ROELL, RMR

8     SEPTEMBER 7, 2003.       NOTARY PUBLIC-STATE OF

9                              KENTUCKY

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

321

1                  UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF OHIO
2                       WESTERN DIVISION
                          -    -    -
3    PAMELA S. SILVEY and        :
     KENNETH E. SILVEY,          :
4                    PLAINTIFFS,:
     -VS-                        :    CASE NO. C-1-01-164
5    SMITHKLINE BEECHAM          :
     CORPORATION,                :
6                    DEFENDANT. :
                          -    -    -
7
         Lois A. Roell, RMR, a court reporter,
8    first duly cautioned and sworn, testifies and
     affirms that PAMELA SUE SILVEY, a plaintiff
9    herein, was notified that the transcript was ready
     for review and signature on January 9, 2003, by
10   forwarding a copy of the transcript to Calvin S.
     Tregre, Jr., Esq.
11
         Within thirty-one days (pursuant to Rule
12   (30)E of the Federal Rules of Civil Procedure),
     PAMELA SUE SILVEY, a plaintiff herein, did not
13   present signature of said deposition.

14       The original transcript is now being
     tendered into the hands of Edward E. Taber, Esq.
15
         Further affiant sayeth naught.
16

17            _____
              Lois A. Roell, RMR
18
     Sworn to me and subscribed in my presence this
19   day of                    , 2003.

20            _____
              Susan M. Sharp
21            Notary Public:  State of Ohio
              My commission expires:
22            08/04/2004

23

24