# EXHIBIT D

1

1       UNITED STATES DISTRICT COURT

2        SOUTHERN DISTRICT OF OHIO

3          WESTERN DIVISION

4            -   -   -

5    PAMELA S. SILVEY AND       :

6    KENNETH E. SILVEY,         :

7           PLAINTIFFS,   :

8      -VS-                :    CASE NO. C-1-01-164

9    SMITHKLINE BEECHAM          :

10   CORPORATION,               :

11           DEFENDANT.    :

12            -   -   -   -

13       UNITED STATES DISTRICT COURT

14      WESTERN DISTRICT OF WASHINGTON

15            AT SEATTLE

16   - - - - - - - - - - - - - - -

17   IN RE PHENYLPROPANOLAMINE (PPA) :

18   PRODUCTS LIABILITY LITIGATION    :   MDL NO. 1407

19   - - - - - - - - - - - - - - -

20       Deposition of LAURA R. SAUERBECK, R.N., a

21   witness herein, taken by the defendant as upon

22   cross-examination pursuant to the Federal Rules of

23   Civil Procedure and pursuant to Notice to Take

24   Deposition and Subpoena Duces Tecum duly issued

2.

1    and served, and stipulations hereinafter set forth

2    at the Cincinnati Marriott Rivercenter, 10 West

3    Rivercenter Boulevard, Covington, Kentucky, at

4    2:32 p.m. on Thursday, March 13, 2003, before Lois

5    A. Roell, RMR, a notary public within and for the

6    State of Kentucky, and also by audiovisual means

7    before Susan M. Sharp.

8                              --   --   --

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

3

1    APPEARANCES:

2      On behalf of the Plaintiffs:

3            Janet G. Abaray, Esq.

4                  and

5            Calvin S. Tregro, Jr., Esq.

6                  of

7            Lopez, Hodes, Restaino, Millman & Skikos

8            312 Walnut Street, Suite 2090

9            Cincinnati, Ohio  45202

10     On behalf of the Defendant:

11           Robert C. Tucker, Esq.

12                 and

13           Edward E. Taber, Esq.

14                 of

15           Arter & Hadden, LLP

16           1100 Huntington Building

17           925 Euclid Avenue

18           Cleveland, Ohio  44115-1475

19     On behalf of the Witness:

20           E. Jason Atkins, Esq.

21                 of

22           Hemmer, Spoor, Pangburn, DeFrank, PLLC

23           250 Grandview Drive, Suite 200

24           Ft. Mitchell, Kentucky  41017

20

1    be possible for us to speak with that person and

2    ask them would they be willing to be interviewed?"

3    And then they had an opportunity to say yes or no.

4            Q.    So the proxy was intended to help

5    you confirm the information that you were

6    obtaining from the patient that you had

7    interviewed?

8            A.    They were looking at the usefulness

9    of using proxies.

10           Q.    Okay.  Now, with respect to

11   Mrs. Silvey, in response to the subpoena, were you

12   able to determine whether in fact you interviewed

13   Mrs. Silvey during her hospitalization at Good

14   Samaritan Hospital in the first two months of

15   1998, January and/or February of 1998?

16           A.    Let's see, according to this it

17   looks -- that is my code -- that I interviewed her

18   on, it looks like February 13th of 1998.

19               MS. ABARAY:  I'm sorry, did you say

20   it is or it isn't?

21               THE WITNESS:  It is my code.

22               MS. ABARAY:  Thank you.

23   BY MR. TUCKER:

24           Q.    And your code is number 303?

26

1    person from the subject, and if it's not from the

2    subject, then we indicate who it's from.

3         Q.    Okay.  Let me just correct the

4    question so that the objection is removed.

5              Would you please tell us where the

6    information comes from that is used to fill out

7    Form 2C.

8         A.    This particular form, it says

9    "Case," so it would have come from the person I

10   was interviewing, and it also says "Proxy stated,"

11   so it would also have come from the proxy.

12        Q.    Is this information that you

13   yourself obtained from the case and from the proxy

14   and then wrote down on Form 2C and filled out?

15        A.    Yes.

16        Q.    Would you please read to us what you

17   wrote down in information that you obtained both

18   from the case and from the proxy under the

19   symptoms.

20        A.    "Case doesn't remember feeling ill

21   on 1/15/1998.  Left for work at approximately 6

22   a.m.  Was smoking a cigarette and drinking coffee

23   at time.  That's the last thing that case

24   remembers.  Proxy stated that the case had not

27

1    complained of feeling ill on 1/15/98.

2    Approximately 45 minutes after the case had left

3    for work, he found her van in a ditch with slight

4    damage.  Case was restrained by seat belt and

5    unresponsive."

6            Q.    Now, there is a subject interview

7    questionnaire form that you would have filled out

8    in the course of interviewing Mrs. Silvey; am I

9    right about that?

10           A.    Correct.

11           Q.    Am I right to understand that that's

12   what's called Form 04?

13           A.    Yes.

14           Q.    And do you have Form 04 in front of

15   you?

16           A.    Yes.

17           Q.    Would you please tell us is that

18   your handwriting?

19           A.    Yes.

20           Q.    And it says person completing form,

21   303, that's your number?

22           A.    Uh-huh.

23           Q.    And it says that the date of the

24   interview was February 13, 1998; is that right?

28

1    A.    Yes.

2    Q.    Does it give a time?

3    A.    9:30 a.m.

4    Q.    Okay.  In the course of the

5    interview, would you explain to the case or to the

6    patient, the subject, what the interview was

7    about, why you were conducting it?

8    A.    Well, we first would approach the

9    case, we had a script to go for -- go by, and

10   that's on Form 03C.

11   Q.    And generally would you tell us what

12   that script was that you would tell the patient.

13   A.    It says, "Hello, my name is," and I

14   would introduce myself.  "I am working with the

15   Hemorrhagic Stroke Project.  This is a research

16   study designed -- or excuse me, this is a research

17   study investigating the causes of stroke in young

18   people.  This study is being conducted from Yale

19   University School of Medicine," and in parentheses

20   it says "in Connecticut, and we are visiting

21   patients at 43 hospitals nationwide, including,"

22   and I would say "Good Samaritan Hospital.  Your

23   doctor, Dr. VanLoveren, has given us permission to

24   talk with you.  Is this a good time to speak with

29

1   you?"  And then we would go on.  It says, "The

2   goal of the study is to understand better the

3   causes of stroke in young people," and then we

4   would validate some information.

5          Q.    And with respect to Mrs. Silvey, did

6   you validate that information?

7          A.    Yes.  We validated her date of

8   birth, and then before the submission we asked if

9   they've ever been diagnosed with a stroke or a

10  mini-stroke, sometimes called a transient ischemic

11  attack or TIA.  And if they said yes, then we

12  would probe what kind of stroke did they have.  If

13  they answered correctly to this, they were

14  eligible to participate, and then we would read

15  on, and it says, "Good, since you are eligible, I

16  would like you to participate in our study.  If

17  you choose not to participate, that will have no

18  effect in your relationship with your doctor or

19  this hospital.  If you do agree to participate, I

20  will ask you a series of questions about your

21  medical history and medications you may have

22  recently taken.  This interview should take only

23  about 30 to 45 minutes of your time and can be

24  done at a time of your choice.  If you do agree to

33

1    headache.

2         Q.    And then after finding, getting nos

3    to all of those questions, what's the next

4    question you asked?

5         A.    "Now I would like you to try to

6    recall any medications you may have used during

7    this time period. Please look at the calendar

8    again and take a minute to think about any other

9    medications or drugs you may have taken on the

10   index date or on the three days before that date

11   or at any time during these two weeks. We are

12   interested in any medication you may have taken,

13   including those prescribed by a doctor or that you

14   bought over-the-counter."

15        Q.    And what did she answer to that?

16        A.    She -- I have none recalled. So I

17   don't know what her exact words were but --

18        Q.    She answered -- What were the

19   choices that she could have given you?

20        A.    She could have listed any

21   medications that she recalled.

22        Q.    You circled here none recalled?

23        A.    Uh-huh.

24        Q.    With respect to illness symptoms and

34

1    medication use, did you have other questions that

2    you asked her?

3              A.    I guess you're asking about the same

4    section of the questionnaire?

5              Q.    Yes.  Did you go on from that last

6    question?

7              A.    Right.

8              Q.    And were there additional questions

9    about specific medications?

10             A.    Yes.

11             Q.    And what was that question?

12             A.    "Now I would like to review some

13   specific medications you may have taken during

14   this time period.  Did you take," and then I would

15   ask, aspirin, get a response; then I would go on

16   to acetaminophen and give an example, such as

17   Tylenol; anti-inflammatories, such as Advil,

18   Motrin, Naprosyn, or Feldene; blood thinners, such

19   as Coumadin; asthma medications, an inhaler,

20   Theophylline, or Prednisone; medications for

21   depression, such as Marplan, Nardil, or Parnate;

22   or hemorrhoidal preparations.

23             Q.    And her answer for all of those

24   questions as to those medications being taken or

35

1    not was what?

2        A.   No.

3        Q.   She had not taken them?

4        A.   That's what this indicates.

5        Q.   With respect to the questionnaire,

6    were there questions asked about other types of

7    either caffeine use, alcohol use, other medical

8    conditions?

9        A.   There were questions about caffeine

10   use, alcohol use, tobacco use, street drug use,

11   which was prior to that, weight and eating

12   behaviors, family history, medical history,

13   gynecological history, socioeconomic information.

14       Q.   And with respect to those questions,

15   you just leafed through the pages, did you find

16   that she answered all of your questions and you

17   noted the answers to the questions?

18       A.   It will take me a minute to see if

19   she answered all.

20        MS. ABARAY:  Objection, overbroad,

21   vague.  The document speaks for itself.

22       A.   There is one question she did not

23   answer or she answered with a don't know, and that

24   is the question about the household income.

39

1          A.    The patient can discuss almost

2    everyday problems with little or no assistance.

3    Reduction of speech and/or comprehension, however,

4    makes conversation about certain material

5    difficult or impossible.

6          Q.    And you rated her at a 4; is that

7    correct?

8          A.    That's what that definition was,

9    yes.

10         Q.    Did you find that there was any

11   language difficulty during the course of the

12   interview?

13              MS. ABARAY:  Objection.  Are you

14   asking for her recollection or what's in the

15   document?

16         Q.    Okay, let me rephrase the question

17   to address counsel's objection.

18              Did you rate her language ability

19   during the interview?

20         A.    Yes.

21         Q.    And what did you rate it as?

22         A.    Her language ability on the subject

23   during interview is no language problem.

24         Q.    Did you rate your confidence in the

40

1    ability of Mrs. Silvey to give you an accurate

2    history?

3         A.    Yes, I did.

4         Q.    Okay.  And what did you rate

5    Mrs. Silvey in terms of your confidence, having

6    just completed the interview, in her ability to

7    give you an accurate history?

8         A.    Confident.

9         Q.    Were you asked as a part of the

10   interviewer observations whether the interview was

11   completed?

12        A.    Yes.

13        Q.    And what did you say?

14        A.    Yes.

15        Q.    And were you asked whether there was

16   little or no missing information?

17        A.    Yes.

18        Q.    And what did you say?

19        A.    I circled the response for yes,

20   interview completed with little, in parentheses,

21   less than one-tenth or no missing information.

22        Q.    Following up the interview of

23   Mrs. Silvey, did you have occasion to interview

24   her husband, Kenneth Silvey?

41

1          A.    Yes.

2          Q.    And when did you interview

3    Mr. Silvey?

4          A.    February 14th, 1998.

5          Q.    And do you have a time that the

6    interview was conducted?

7          A.    10:05 a.m. it started.

8          Q.    And did you do this in a

9    face-to-face interview?

10         A.    Wait a second here.  Yes.  It says

11   subject's home.

12         Q.    So you would have done this

13   interview of Mr. Silvey at his home?

14         A.    Yes.

15         Q.    During the course of the interview

16   of Mr. Silvey you also filled out a questionnaire?

17         A.    Yes.

18         Q.    And the questionnaire records his

19   responses to you of the questions that you asked

20   about his wife?

21         A.    Correct.

22         Q.    Would you tell us, did you ask

23   about, Mr. Silvey any questions about whether his

24   wife had had any illness in the weeks leading up

42

1   to her stroke?

2          A.    I asked specific questions, "First I

3   would like to ask you about some common illness

4   symptoms.  Do you recall," I would have inserted

5   her name, "having a cough anytime during this

6   two-week period?"  And I would also have asked

7   about the runny nose, nasal congestion, sore

8   throat, and headache.

9          Q.    So we understand, then, you would

10  have specifically asked Mr. Silvey do you recall

11  your wife, Mrs. Silvey, having a cough at any time

12  during the two weeks before her stroke, that's the

13  question you would have asked?

14         A.    Do you recall, and I would have

15  probably said Pam or Pamela, having a cough at any

16  time during this two-week period.

17         Q.    What did he -- And the two-week

18  period is when?

19         A.    The two-week period is the index

20  date and the two weeks prior to the period of the

21  index date as indicated on the calendar.

22         Q.    And what did he say to that?

23         A.    No.

24         Q.    What did he say when you asked the

43

1    question about whether he recalled her having a

2    runny nose?

3        A.    No.

4        Q.    What about, what did he answer to

5    you when you asked the question about nasal

6    congestion?

7        A.    No.

8        Q.    What about sore throat?

9        A.    No.

10        Q.    Or headache?

11        A.    No.

12        Q.    Did Mr. Silvey indicate that his

13    wife or recall that his wife had taken any

14    medication during that two-week period of time?

15        A.    This indicates that none was

16    recalled.

17        Q.    During the course of your interview

18    of Mr. Silvey, did you ask him questions similar

19    to the questions that you had asked Mrs. Silvey in

20    the hospital about caffeine use, alcohol use,

21    tobacco use, and medical history?

22        A.    Yes.

23        Q.    Did he answer all of your questions?

24        A.    He didn't know the response to

44

1  whether or not she had taken any acetaminophen

2  such as Tylenol in the time period indicated.  He

3  did not know the date that her last menstrual

4  period -- the actual day that her last menstrual

5  period had started.

6          Q.    Was he able to give you the month?

7          A.    He indicates 12 of 1997.

8          Q.    Okay.  Any other information that he

9  was not able to provide to you based upon the

10 questionnaire?

11         A.    Not that I see.

12         Q.    Upon completing his questionnaire

13 did you also fill out an interviewer observation

14 form for the questions?

15         A.    Yes.

16         Q.    And how did you rate your confidence

17 in the ability of Mr. Silvey to give you an

18 accurate history regarding his wife?

19         A.    Confident.

20         Q.    Was there any language difficulty

21 during the course of the interview?

22         A.    No.

23         Q.    Was the interview -- Did you note

24 whether the interview was completed?

48

1          A.    Pamela Silvey.

2          Q.    Would you and Dr. Broderick have

3     authored this letter together, is that why you

4     both signed it?

5          A.    I don't remember who authored it

6     truthfully.

7          Q.    Okay.  But you signed it as one of

8     the hemorrhagic stroke study study coordinators;

9     is that right?

10         A.    Correct.

11         Q.    Am I right to understand,

12    Mrs. Sauerbeck, that the purpose of this letter

13    was in part to update patients on the preliminary

14    results of the hemorrhagic stroke study that had

15    been carried out in the Greater Cincinnati area as

16    well as in the hospitals elsewhere around the

17    country?

18         A.    Yes.

19         Q.    And you go on to say what the

20    primary purpose of the study was.  Would you read

21    that into the record for us, please, what the

22    primary study of the study was.

23         A.    This states that "The primary

24    purpose of this study was to evaluate whether the

49

1    use of phenylpropanolamine, a medication found in

2    appetite suppressants and in some cough/cold

3    preparations, may be associated with the

4    development of a brain hemorrhage."

5        Q.    And why don't you read for the

6    record, please, just that next sentence.

7        A.    "As you recall, detailed questions

8    about medications were asked at the time you were

9    evaluated and similar questions were asked of

10   persons in the community of similar age, gender,

11   race who did not have a hemorrhage."

12       Q.    And then the letter goes on to speak

13   about an article that was under review by the New

14   England Journal of Medicine and then actions being

15   reviewed by the FDA; am I right about that?

16       A.    Yes.

17       Q.    Now, we've marked as Exhibit 2 the

18   notebook of information that you have in front of

19   you there, and that notebook contains the

20   questionnaires and the responses for Mr. and Mrs.

21   Silvey that we've just gone through --

22       A.    Yes.

23       Q.    -- am I right about that?  The

24   questionnaires that were filled out by you after

50

1    interviewing Mrs. Silvey does not indicate that

2    she was taking any medication at the time of the

3    index event; am I right about that?

4            A.    Yes.

5            Q.    Or the two weeks before; am I right?

6            A.    Yes.

7            Q.    The interview of her proxy,

8    Mr. Silvey, does not show that she had been taking

9    any medication in the two weeks preceding the

10    index event; am I right about that?

11            A.    Yes.

12            Q.    This letter, Exhibit 3, when it was

13    sent to Mrs. Silvey, was not being sent to her

14    because she had taken medication containing PPA

15    prior to her stroke, was it?

16                    MS. ABARAY:    Objection, leading.

17            Q.    That was not the purpose of the

18    letter?

19                    MS. ABARAY:    Leading.

20            A.    The purpose was to inform them of

21    the results of the study that they participated

22    in.

23            Q.    But someone receiving this letter

24    was not supposed to believe that they had actually

52

1          A.    Correct.

2          Q.    Based upon the questionnaire and the

3    information that was obtained from Mrs. Silvey,

4    she gave you information that would conclude that

5    she was an unexposed case for the study, correct?

6               MS. ABARAY:  Objection, leading.

7          A.    I was not involved with the analysis

8    or making those determinations.  My involvement

9    was to ask the questions.

10         Q.    But the information that she gave

11   you did not indicate an exposure to PPA?

12         A.    It did not indicate that she was on

13   any medications.

14         Q.    Okay.  And the proxy confirmed that,

15   her husband confirmed that in his interview,

16   correct?

17              MS. ABARAY:  Objection, leading.

18         Q.    Let me rephrase the question.  Did

19   her husband confirm his wife's responses?

20              MS. ABARAY:  Objection.

21         A.    I didn't ask him about his wife's

22   responses.  I asked him his -- what he remembered.

23         Q.    And were they consistent from the

24   standpoint that he did not recall her taking

53

1    medication?

2             A.    Yes.

3             Q.    Now, you and I have never met

4    before, just before we started this about 50

5    minutes ago; am I right about that?

6             A.    Not that I recall.

7             Q.    You know that Mrs. Silvey is being

8    represented by Mrs. Abaray?

9             A.    Yes.

10            Q.    And you have met Mrs. Abaray before;

11   am I right about that?

12            A.    Yes.

13            Q.    Did you know before today that

14   Mrs. Abaray was representing Mrs. Silvey in this

15   case?

16            A.    Not until I received a subpoena.

17            Q.    That was the first time that you

18   learned that Mrs. Abaray was representing

19   Mrs. Silvey?

20            A.    That's the first time I learned

21   anything about this particular lawsuit.

22            Q.    Okay.    Finding out that Mrs. Abaray

23   was representing Mrs. Silvey, did you have an

24   opportunity to speak to her about the claim that's

60

1          Q.    Okay.  Would you tell us what

2    hospital?

3          A.    Good Samaritan Hospital.

4          Q.    And does it provide you with

5    information as to it being a trauma admission

6    history and physical?

7          A.    Correct.

8          Q.    Would you tell us, please, what does

9    it say with respect to medications?

10         A.    None.

11         Q.    Do you have any information other

12   than the questionnaire information you obtained

13   directly from Mrs. Silvey, the questionnaire

14   information you received directly from Mr. Silvey,

15   or these medical records which would suggest or

16   provide evidence that Mr., that Mrs. Silvey, I'm

17   sorry, was using medication in the period of time

18   shortly prior to her stroke?

19         A.    I do not.

20              MR. TUCKER:  Thank you very much.

21   Nothing further.

22              MS. ABARAY:  Thank you,

23   Ms. Sauerbeck, I would just like to follow up if I

24   could very quickly.  I'm sorry that we're imposing

64

1    Mrs. Silvey or Mr. Silvey and say do you remember

2    taking Contact or Benadryl or --

3              A.    No.

4              Q.    -- DayQuil, you wouldn't show them

5    products?

6              A.    The only -- We didn't show products

7    unless somebody had a positive response that they

8    were taking a medication.  If they did do that, we

9    would try to do, what we would call product ID

10   book to confirm that it was indeed that

11   medication.  In addition, after the interview we

12   would also ask to see or get information off of

13   any packaging a person may have had.

14             Q.    And is the reason that you avoid

15   showing those types of things because it might

16   refresh memory and you didn't want to get involved

17   in that?

18             MR. TUCKER:  Objection to

19   refreshing memory.

20             A.    I just -- That was part of our

21   protocol, we were instructed not to do that.

22             Q.    All right.  Although you said you

23   don't have a specific recollection of Ms. Silvey,

24   you had an opportunity to look at some of the

76

1          Q.    And February 19th of 1998, how does

2     that compare to the date that you performed the

3     interview of Ms. Silvey?

4          A.    Five days.

5          Q.    So five days after you completed

6     your interview of Ms. Silvey, Dr. Wunder concluded

7     that she had cognitive impairment?

8          A.    That's what it states under

9     impression, yes.

10              MS. ABARAY:  Thank you.  I have no

11     further questions, Ms. Sauerbeck.

12                   FURTHER CROSS-EXAMINATION

13     BY MR. TUCKER:

14          Q.    Ms. Sauerbeck, in conducting the

15     interview of Mrs. Silvey and in filling out the

16     questionnaire, asking her the questions, listening

17     to her responses, did you determine that she was

18     cognitively impaired and incapable of answering

19     the questions in the questionnaire?

20              MS. ABARAY:  Objection, compound.

21          A.    Based on the screening, which was

22     our criteria to say whether or not somebody could,

23     was cognitive enough, she passed the test, and so

24     she was acceptable to be interviewed.

77

1        Q.    So you did not determine for

2    purposes of filling out the questionnaire and

3    answering your questions, you did not determine

4    her to be cognitively impaired, correct?

5              MS. ABARAY:   Objection.

6        A.    It's not my responsibility to

7    determine cognitive impairment.

8        Q.    But in terms of passing the

9    screening cognitive standards, she did?

10        A.    The cognitive evaluation was

11    acceptable, yes.

12        Q.    Okay.  Now, Mrs. Abaray asked you

13    about a product identification book --

14        A.    Yes.

15        Q.    -- that would be used during the

16    course of your interview and filling out the

17    questionnaire; do you remember that she asked you

18    about that?

19        A.    Yes.

20        Q.    And there was a product

21    identification book, correct?

22        A.    Correct.

23        Q.    And am I right to understand that

24    the product identification book was not shown to

78

1    Mrs. Silvey?

2            A.    I cannot recall the specific

3    interview, but unless somebody listed a

4    medication, the product ID book was not shown.

5            Q.    And she didn't indicate that she had

6    taken any medication, correct?

7            A.    Correct.

8            Q.    And her husband didn't indicate that

9    she had taken any medication, correct?

10            A.    Correct.

11            MR. TUCKER:    The Court told us that

12    we had an hour to ask you questions, we've taken a

13    little bit more of your time than that, so I will

14    stop at this point.    Thank you very much.

15            MS. ABARAY:    Thank you.    Could I

16    just ask one more quick question.

17            FURTHER EXAMINATION

18    BY MS. ABARAY:

19            Q.    Looking back at Form 2, which is the

20    case evaluation form.

21            A.    Yes.

22            Q.    There's a column for yes, no, and

23    then NM; do you see that?

24            A.    Not mentioned.

86

1                    C E R T I F I C A T E

2    STATE OF KENTUCKY      :

3                          :   SS

4    STATE AT LARGE        :

5        I, LOIS A. ROELL, RMR, the undersigned, a

6    duly qualified and commissioned notary public

7    within and for the State of Kentucky, do hereby

8    certify that before the giving of her aforesaid

9    deposition, the said LAURA R. SAUERBECK, R.N., was

10   by me first duly sworn to tell the truth, the

11   whole truth and nothing but the truth; that the

12   foregoing is the deposition given at said time and

13   place by the said LAURA R. SAUERBECK, R.N.; that

14   said deposition was taken in all respects pursuant

15   to Subpoena and Notice to Take Deposition; that

16   said deposition was taken by me in stenotypy and

17   transcribed by computer-aided transcription under

18   my supervision; that the transcribed deposition is

19   to be submitted to the witness for her examination

20   and signature; that I am neither a relative of nor

21   attorney for any of the parties to this cause, nor

22   relative of nor employee for any of their counsel,

23   and have no interest whatever in the result of the

24   action.

SPANGLER REPORTING SERVICES, INC.

PHONE (513) 381-3330   FAX (513) 381-3342

87

1          IN WITNESS WHEREOF, I hereunto set my

2     hand and official seal of office at Cincinnati,

3     Ohio, this       day of                  , 2003.

4

5

6

7     MY COMMISSION EXPIRES:   LOIS A. ROELL, RMR

8     SEPTEMBER 7, 2003.       NOTARY PUBLIC-STATE OF

9                              KENTUCKY

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

88

1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF OHIO
2                          WESTERN DIVISION
                             -   -   -
3    PAMELA S. SILVEY,                 :
     AND KENNETH E. SILVEY,            :
4                    PLAINTIFFS,       :
     -VS-                              :  CASE NO. C-1-01-164
5    SMITHKLINE BEECHAM                :
     CORPORATION,                      :
6                    DEFENDANT.        :
                             -   -   -
7

8          Lois A. Roell, RMR, a court reporter,
     first duly cautioned and sworn, testifies and
9    affirms that LAURA R. SAUERBECK, R.N., a witness
     herein, was notified that the transcript was ready
10   for review and signature on March 17, 2003, by
     forwarding a copy of the transcript to Jason
11   Atkins, Esq.

12         Within thirty-one days (pursuant to Rule
     (30)E of the Federal Rules of Civil Procedure),
13   LAURA R. SAUERBECK, R.N., a witness herein, did
     not present signature of said deposition.

14         The original transcript is now being
     tendered into the hands of Edward E. Taber, Esq.
15

16         Further affiant sayeth naught.

17                    _____

18                    Lois A. Roell, RMR

     Sworn to me and subscribed in my presence this
19   day of                    , 2003.

20

21                    _____
                      Susan M. Sharp
                      Notary Public:  State of Ohio
22                    My commission expires:
                      09/04/2004

23

24